**NOT FOR PUBLICATION**

UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

| | |
|---|---|
| OCEANA, INC.; GREENPEACE, INC., | No. 15-35940 |
| Plaintiffs-Appellants, | D.C. No. 3:14-cv-00253-TMB |
| v. | |
| NATIONAL MARINE FISHERIES SERVICE; UNITED STATES DEPARTMENT OF COMMERCE; et al., | MEMORANDUM[*] |
| Defendants-Appellees, | |
| ADAK COMMUNITY DEVELOPMENT CORPORATION; et al., | |
| Intervenor-Defendants-Appellees. | |

Appeal from the United States District Court
for the District of Alaska
Timothy M. Burgess, Chief Judge, Presiding

Argued and Submitted August 17, 2017
Anchorage, Alaska

Before: GRABER, CLIFTON, and M. SMITH, Circuit Judges.

---

[*] This disposition is not appropriate for publication and is not precedent except as provided by Ninth Circuit Rule 36-3.

Plaintiffs Oceana, Inc., and Greenpeace, Inc., timely appeal the district court's grant of summary judgment to the National Marine Fisheries Service ("the Service") and other defendants in this action, which challenges the Service's 2014 biological opinion and final environmental impact statement assessing the effect of proposed fishing regulations on the western distinct population segment of Steller sea lions.[1]  Reviewing de novo the district court's grant of summary judgment, Nat. Res. Def. Council, Inc. v. Pritzker, 828 F.3d 1125, 1133 n.8 (9th Cir. 2016), we affirm.

1.  The Service violated neither the Endangered Species Act of 1973 nor the Administrative Procedure Act when it concluded, in its 2014 biological opinion, that the proposed fishing regulations were "not likely to jeopardize the continued existence of" the Steller sea lions and were not likely to "result in the destruction or adverse modification of [designated critical] habitat" of the Steller sea lions.  16 U.S.C. § 1536(a)(2).  In making that determination, the Service rationally assessed many factors, including the scientific uncertainty of the effect, if any, of fisheries on Steller sea lion populations and the extent of expected overlap between commercial fishing and the foraging of Steller sea lions.  Although the Service had

---

[1] For simplicity, we will use the term "Steller sea lions" to refer exclusively to the western distinct population segment.

2

concluded, four years earlier, that fishing regulations were likely to jeopardize the Steller sea lions, the 2014 biological opinion explained, in detail and by reference to significant expert analyses that post-dated the 2010 opinion, why the Service reached a different conclusion this time.

The 2014 biological opinion acknowledged that the plight of Steller sea lions is the subject of significant scientific uncertainty and debate. But the Endangered Species Act requires the Service to determine whether the proposed action is "likely to jeopardize the continued existence of" the Steller sea lions. 16 U.S.C. § 1536(a)(2). By its nature, a "likelihood" analysis necessarily requires a consideration of probabilities. Indeed, one can never be <u>certain</u> about consequences, especially in situations involving complex food chains and a swirl of competing scientific theories and data. Here, the Service properly assessed whether allowing fishing under specific conditions—at certain times, depths, locations, etc.—is <u>likely</u> to jeopardize the species' <u>existence</u>.

In answering that question, the Service looked to the voluminous scientific record and concluded that—because the overall fish populations appear adequate for recovery, because the regulations impose stringent catch limits, because the regulations will result in some partitioning, and because many studies have shown no connection between fishing and the population of Steller sea lions—the

3

proposed regulations are not likely to jeopardize the species. To the extent that the Service disagreed with some scientific opinions and agreed with other opinions, its choice is not arbitrary: "experts in every scientific field routinely disagree," and resolving scientific uncertainty is the agency's task. Lands Council v. McNair, 537 F.3d 981, 1001 (9th Cir. 2008) (en banc), overruled on other grounds by Winter v. Nat. Res. Def. Council, Inc., 555 U.S. 7 (2008).

2. The Service did not err by failing to identify a tipping point beyond which the species cannot recover. We have held that, when a proposed action will have significant negative effects on the species' population or habitat, the duty to consider the recovery of the species necessarily includes the calculation of the species' approximate tipping point. Wild Fish Conservancy v. Salazar, 628 F.3d 513 (9th Cir. 2010); Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv., 524 F.3d 917 (9th Cir. 2008). But, here, the Service rationally concluded that there would be no significant effect on the Steller sea lions' population or habitat, in the Western Aleutian Islands or elsewhere. See, e.g., Nat'l Wildlife Fed'n, 524 F.3d at 934–35 ("[T]he 2004 BiOp explicitly found that the proposed [agency] operations would have significant negative impacts on each affected species' critical habitat through 2010, in spite of planned mitigation efforts."). In the circumstances, the

4

Service was not required to calculate a tipping point for the species as a whole or in any sub-region.

3. The Service's determination of some amount of partitioning between the commercial fishing and the Steller sea lions' foraging—in depth for pollock and in space for Atka mackerel—was supported by the record. "[W]e generally must be at our most deferential when reviewing scientific judgments and technical analyses within the agency's expertise." Lands Council v. McNair, 629 F.3d 1070, 1074 (9th Cir. 2010) (internal quotation marks and brackets omitted). "We have stressed that we must defer to the agency's interpretation of complex scientific data so long as the agency provides a reasonable explanation for adopting its approach and discloses the limitations of that approach." Alaska Oil & Gas Ass'n v. Pritzker, 840 F.3d 671, 679 (9th Cir. 2016) (internal quotation marks omitted), petitions for cert. filed, ___ U.S.L.W. ___ (U.S. July 21, 2017) (Nos. 17-118, 17-133). "The determination of what constitutes the 'best scientific data available' belongs to the agency's special expertise. When examining this kind of scientific determination, as opposed to simple findings of fact, a reviewing court must generally be at its most deferential." San Luis & Delta-Mendota Water Auth. v. Jewell, 747 F.3d 581, 602 (9th Cir. 2014) (internal quotation marks and ellipsis omitted).

The Service's determinations here survive that scrutiny. The data used by the Service were imperfect, but no other data exist, and the Service acknowledged the limitations of the data and used its best scientific judgment.[2] When better information exists, the Service must use that information or explain why it did not use it. Id. But "where the information is not readily available, we cannot insist on perfection: The 'best scientific data available,' does not mean 'the best scientific data possible.'" Id. (some internal quotation marks, alteration, and ellipsis omitted).

4. The Service did not fail to discuss "responsible opposing view[s]" in its final environmental impact statement. 40 C.F.R. § 1502.9(b). Plaintiffs point to two internal critiques of a draft of a document that became, after editing, the 2014 biological opinion. Those critiques questioned the draft's reliance on certain data and the draft's reaching of broad conclusions from the data. The final 2014 biological opinion adopted some of the points raised by the critiques, and it explained why a limited, cautious use of the data was warranted. Neither the 2014 biological opinion nor the final environmental impact statement disclosed that

_____

[2] In Natural Resources Defense Council, 828 F.3d at 1140, we held that the Service's decision not to use the precautionary principle when faced with no data from which to draw conclusions "was a policy choice, not a scientific determination." Here, the Service's reasoned decision to use the available scientific data in a limited fashion was a scientific judgment, not a policy choice.

some scientists had criticized the earlier draft. But we find no error in that lack of disclosure. Compare Greater Yellowstone Coal. v. Lewis, 628 F.3d 1143, 1151–52 (9th Cir. 2011) (holding that the agency did not err by failing to disclose "some uncertainty" about the model), with Ctr. for Biological Diversity v. U.S. Forest Serv., 349 F.3d 1157, 1166–69 (9th Cir. 2003) (holding that the agency erred because it failed to mention significant scientific disagreement with the agency's key conclusion).

**AFFIRMED.**